# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. | JOSEPH GOODLY, on behalf of himself and other persons similarly situated, ) ) ) | |
| | Plaintiffs, ) ) | |
| | vs. ) ) | Case No.: 4:16-cv-334-GKF-JFJ |
| 1. | CHECK-6 INC., ) | |
| 2. | YAREMA SOS, ) | |
| 3. | BRIAN BRURUD, ) | |
| 4. | DENNIS ROMANO, ) | |
| 5. | S. ERIC BENSON, ) | |
| 6. | LAURA OWEN, and ) | |
| 7. | JOHN DILLON, ) ) | |
| | Defendants. ) | |

## MOTION FOR SUMMARY JUDGMENT
## OF DEFENDANTS, CHECK-6, INC.,
## YAREMA SOS, AND BRIAN BRURUD

JOHN H. TUCKER, OBA# 9110
jtucker@rhodesokla.com
DAN S. FOLLUO, OBA# 11303
dfolluo@rhodesokla.com
DENELDA L. RICHARDSON, OBA# 20103
drichardson@rhodesokla.com
RHODES HIERONYMUS JONES TUCKER & GABLE
P.O. Box 21100
Tulsa, Oklahoma 74121-1100
(918) 582-1173; (918) 592-3390 (fax)

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES .......................................................................................... ii

I.      UNDISPUTED MATERIAL FACTS SUPPORTING SUMMARY
        JUDGMENT FOR DEFENDANTS ................................................................... 1

II.     ARGUMENT AND AUTHORITIES .............................................................. 1

        A.      History and Purpose of the FLSA is to Protect Unskilled Laborers
                and Minimum Wage-Earners ................................................................. 1

        B.      Coaches' Contracts with Check-6 Make it Clear They are
                Independent Contractors ......................................................................... 6

        C.      Coaches are Independent Contractors and not Employees
                Under the FLSA and Economic Realities Test ..................................... 9

        D.      FLSA White Collar Exemptions ........................................................ 11

                1.      Administrative Employee Exemption Exempts Coaches ......................... 12

                2.      Salary Test or Fee Basis ............................................................ 13

                3.      Highly Compensated Exemption Applies as Well .................................. 16

III.    CONCLUSION ............................................................................................ 17

i

## <u>TABLE OF AUTHORITIES</u>

**Pages**

**Cases:**

*A.H. Phillips, Inc. v. Walling,*
     324 U.S. 490 (1945) ............................................................................................ 11

*Barringer v. Baptist Healthcare of Oklahoma,*
     2001 OK 29, 22 P.3d 701 (Okla. 2001) ................................................................ 8

*Coley v. Vannguard Urban Improvement Ass'n.,*
     2018 U.S. Dist. LEXIS 50787 (E.D. N.Y. Mar. 27, 2018) ................................... 16

*Dewan v. M-I, LLC,*
     858 F.3d 331 (5th Cir. 2017) .............................................................................. 13

*Elwell v. Univ. Hosps. Home Care Servs.,*
     276 F.3d 832 (6th Cir. 2002) .............................................................................. 15

*Encino Motorcars, LLC v. Navarro,*
     138 S. Ct. 1134 (2018) ........................................................................................ 11

*Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc.,*
     204 F.3d 673 (6th Cir. 2000) .............................................................................. 15

*Hagadorn v. M.F. Smith & Assocs., Inc.,*
     1999 U.S. App. LEXIS 2361 (10th Cir. 1999) ..................................................... 14

*Howe v. Gov't Leasing Co.,*
     2017 U.S. Dist. LEXIS 216565 (D. Colo. Sep. 26, 2017) .................................... 16

*Karlson v. Action Process Serv. & Private Investigation, LLC,*
     860 F.3d 1089 (8th Cir. 2017) .............................................................................. 7

*Leigh Valley Coal Co. v. Yensavage,*
     218 F. 547 (2d Cir. 1914) .................................................................................... 4

*McComb v. Farmers Reservoir & Irrigation,*
     167 F.2d 911 (10th Cir. 1948) .............................................................................. 2

*SFF-TIR, LLC v. Stephenson,*
     250 F.Supp. 3d 856 (N.D. Okla. 2017) ................................................................ 8

*In re Sweet,*
     954 F.2d 610 (10th Cir. 1992) ........................................................................ 7, 8

*In re Wal-Mart Stores, Inc.,*
    395 F.3d 1177 (10th Cir. 2005)  ...................................................................... 14, 15

*Zelenika v. Commonwealth Edison Co.,*
    2012 U.S. Dist. LEXIS 101784 (N.D. Ill. July 23, 2012) ...................................... 17

**Statutes and Rules:**

*Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §201, *et seq.* .................................. *passim*

*29 U.S.C. § 202 (1938) ............................................................................... 3, 4

*29 U.S.C. § 213(a) .................................................................................... 11

29 C.F.R. § 541.200 .................................................................................. 12

29 C.F.R. § 541.201 .................................................................................. 12

29 C.F.R. § 541.203 .................................................................................. 12

29 C.F.R. § 541.313 .................................................................................. 15

29 C.F.R. § 541.600 ............................................................................... 13, 14

29 C.F.R. § 541.601 ............................................................................... 16, 17

29 C.F.R. § 541.605 .................................................................................. 15

**Other:**

Alton, Larry, *Why the Gig Economy is the Best and Worst Development for Workers Under 30*,
    https://www.forbes.com/sites/larryalton/2018/01/24/why-the-gig-economy-is-the-best-and-
    worst-development-for-workers-under-30/ ............................................................. 9

Atmore, Emily, *Note: Killing the Goose that Laid the Golden Egg: Outdated
    Employment Laws are Destroying the Gig Economy, 102 Minn. L. Rev. 887 (2017)* ........... 10

Carlson, Richard, *Why the Law Still Can't Tell an Employee When it Sees One
    and How it Ought to Stop Trying*, 22 Berkeley J. Emp. & Lab. L. 295 (2001) .................. 3, 4

Cunningham-Parmeter, Keith, *From Amazon to Uber: Defining Employment
    in the Modern Economy*, 96 B.U.L. Rev. 1673 (2016) ........................................... 3

Grossman, Jonathan, *Fair Labor Standards Act of 1938: Maximum*
　　　*Struggle for a Minimum Wage, U.S. Dep't of Labor,*
　　　*https://www.dol.gov/general/aboutdol/history/flsa1938* ....................................................... 2

*Merriam-Webster Dictionary* ............................................................................................. 13

Defendants, Check-6 Inc. ("Check-6" or the "Company"), Yarema Sos, and Brian Brurud, (collectively referred to as "Defendants or Moving Defendants") file their Motion for Summary Judgment ("Motion").  Moving Defendants note that co-Defendants Dennis Romano, S. Eric Benson, Laura Owen, and John Dillon plan to file their separate Motion for Summary Judgment in accordance with the Court's Scheduling Order deadlines.  Co-Defendants' Motion will adopt the arguments made herein, and any relief granted to the Moving Defendants will be applicable to Co-Defendants as well.  However, Co-Defendants have additional arguments to made, making inclusion here unwieldy.  To support their Motion, Moving Defendants offer:

I.     **UNDISPUTED MATERIAL FACTS SUPPORTING SUMMARY JUDGMENT FOR DEFENDANTS**

Defendants refer the Court to Defendants' Undisputed Material Facts Supporting Summary Judgment for Defendants [Dkt. 290] filed previously, and adopted as if fully set forth herein.

II.     **ARGUMENT AND AUTHORITIES**

Defendants should prevail for these reasons: (1) the purpose of the FLSA prevents its application in these circumstances; (2) even if the FLSA applies, an analysis of the "economic realities test" establishes Plaintiffs were independent contractors, not employees of Check-6, and therefore not entitled to overtime compensation; (3) Check-6 Coaches qualify for multiple FLSA exemptions; and (4) the expressed promises made by each Plaintiff in their independent contractor agreement, which included an affirmative representation that each Plaintiff would specifically comply with the provisions of the FLSA, and upon which Check-6 relied, confirm the Plaintiffs were independent contractors.

A.     **HISTORY AND PURPOSE OF THE FLSA IS TO PROTECT UNSKILLED LABORERS AND MINIMUM WAGE-EARNERS.**

The FLSA was enacted to protect unskilled laborers and minimum wage-earners, not highly-paid, highly-skilled consultants like the Plaintiffs here. The FLSA applies only to employees, not independent contractors, and was enacted to protect unskilled laborers and minimum wage-earners. The FLSA is intended to be used as a shield to protect those unskilled laborers and minimum wage-earners who cannot protect themselves.  Instead, Plaintiffs here seek

to weaponize the FLSA as a sword for their own financial gain. Plaintiffs' claims assume, for obvious reasons, the FLSA applies.  The Plaintiffs ignore the threshold issue of whether the FLSA applies.  The Defendants respectfully argue the FLSA does not apply in this situation.

The Act requires employers to pay employees a minimum wage and overtime pay for work over 40 hours in a workweek.  The Tenth Circuit has stated the purpose of the FLSA is "to eradicate from interstate commerce the evils attendant upon low wages and long hours of service." *McComb v. Farmers Reservoir & Irrigation*, 167 F.2d 911, 913 (10th Cir. 1948) (emphasis added).  In determining whether the FLSA should apply, the history must be addressed to fully understand the purpose of the Act.

Before the enactment of the FLSA in the 1930s, many employees were subject to long hours and low wages, well below the living standard.  Large companies had the unfettered power to take advantage of individuals.  They would subject children, for example, to toil up to 18 hours a day in coal mines, factories, and mills, only to pay them $1 a day.  Other employees would be forced to labor in steel factories seven days a week for 12 hours a day, again, with little pay.  Large companies abused their power, ignoring their responsibility of providing for their employees. Franklin Delano Roosevelt ("FDR") responded to a reporter about the situation, stating "Something has to be done about the elimination of child labor and long hours and starvation wages." Jonathan Grossman, *Fair Labor Standards Act of 1938: Maximum Struggle for a Minimum Wage*, U.S. Dep't of Labor, https://www.dol.gov/general/aboutdol/history/flsa1938. FDR understood the imperative nature of protecting children and laborers, in providing them with enough wages to afford the necessities while balancing a healthy life.  He saw large companies abusing their power, prioritizing greed over the health of their employees.  That is the reason he urged Congress to enact the FLSA.

As the FLSA states, the policy of the Act is to prevent the consequences produced by "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202 (1938).  Clearly, the purpose of the FLSA is to protect low wage-earners from the large bargaining deficit because they do not

possess many marketable skills.

In interpreting the FLSA, Legislature has distinguished "employees" and "independent contractors" to ensure that only those who need protection are afforded it. The status of whether an individual is an employee or independent contractor is critical. "Historically, firms reserved the independent contractor designation for entrepreneurial individuals whose skills demanded higher pay in the open market. Legislatures rationalized excluding these laborers from most employment laws because these individuals did not require the same legal protections as potentially more vulnerable, less-skilled 'employees.'" Keith Cunningham-Parmeter, *From Amazon to Uber: Defining Employment in the Modern Economy*, 96 B.U.L. Rev. 1673, 1685 (2016). Further, employees usually need protection because they often possess less skills, less bargaining power, and less business-savvy. Richard Carlson, *Why The Law Still Can't Tell An Employee When It Sees One And How It Ought To Stop Trying*, 22 Berkeley J. Emp. & Lab. L. 205 (2001). Independent contractors rarely need much protection because they frequently possess more marketable skills, more bargaining power, and greater understanding of business, lining up with the purpose of the FLSA (to protect those who cannot protect themselves - unskilled and low wage-earners). *Id*. at 300.

Judge Learned Hand articulated that the whole purpose of statutes like these are to "protect those who are at an economic disadvantage." *Leigh Valley Coal Co. v. Yensavage*, 218 F. 547, 552 (2d Cir. 1914). One basis of his decision was the economic realities, but another was the "statutory purpose approach," in that these laws should reach all workers "economic circumstances appealed for protection." Carlson, 22 Berkeley J. Emp. & Lab. L. at 312. In interpreting these statutes, courts should look at the purpose of the act and apply the protection to those who need it, or to protect those who the act was *intended* to protect.

Here, Check-6 Coaches are independent contractors, not employees, under the FLSA. Check-6 contracts with highly experienced, highly compensated, and skilled veterans to provide management consulting services to companies in various industries, and with Plaintiffs here, paying them on average $1,000 for a full or partial day of work. Fact 35.

3

First, the purpose stated by the FLSA is to protect employees by providing a "minimum standard of living necessary for health, efficiency, and general well-being." 29 U.S.C. § 202 (1938).  With a daily rate of $1,000, Check-6 provides Coaches with well beyond what is necessary for health, efficiency, and general well-being.  If a Coach worked only four weeks out of the year, then he or she would make $28,000 just from working 8% of the year.  Minimum wage at $7.25 an hour, working fulltime, would give an employee working 40 hours a week for 52 weeks about $15,080.  In comparison, Coaches only working four weeks receive almost double minimum wage workers working fulltime all year around.  Check-6 provides Coaches pay well over what is necessary for a minimum standard of living.

Second, the FLSA was enacted because employees could not protect themselves from companies abusing their power and taking advantage of them; companies had superior bargaining power.  Here, Coaches possess great bargaining power, due to their high-level of experience and marketable skills evidenced in part by the premium opportunity for compensation.  Fact 56.  Check-6 is unique; what sets Check-6 apart from other consulting companies is that it contracts with elite military veterans[1] to provide consulting to achieve optimal improved performance and operational efficiency because of the expansive leadership experience of the Coaches.  The very reason Check-6 contracts with these highly experienced military veterans is because of their leadership experience.  Check-6's business model innately gives these Coaches great bargaining power.  Fact 56.  If no highly experienced military veterans wanted to Coach or did not think the pay was enough, then they could choose not to work for Check-6 and put it out of business, because of its business model.[2]  Overall, Coaches have great bargaining power innately because of the

---

[1] Coaches are elite because they all have more experience than the average veteran.  Check-6 Coaches consist of: Green Berets, Navy SEALs, Marines, Astronauts, Delta Force, submarine commanders, Rangers, Air Force Pararescuers, Aircraft Carrier Commanding Officers, Flag Officers, Generals, Admirals, Fleet Anti-Terrorism Security Team, Marine FASTs, and other "special operators".

[2] Because of the nature of its consultancy, Check-6 cannot, and does not, hire or engage the normal able-bodied 30-year old, for example.  It must utilize experienced veterans who already possess the skill required to carry-out consulting services in high-risk environments.

unique business model of Check-6.

Third, Coaches can serve other companies.  The term "employer-employee" relationship stemmed from "master-servant" relationship.  This shows the connection that an employee was only available to work for his or her employer, or master, and no one else.  This inherently shows a dependence on livelihood of the employee.  However, Check-6 does not prohibit Coaches to work for other companies.[3]  Many Coaches own their own businesses. Facts 1-4.  Coaches can, and do, work for or own, other companies.  Facts 1-7. Coaches are not dependent on Check-6 for their livelihood.

Fourth, Coaches do not require protection because they: (1) are highly skilled, (2) are paid well above minimum wage, and (3) are business-savvy entrepreneurs.  Check-6 chooses the most experienced and highly skilled military veterans[4], with which to contract. Facts 55 and 56. These Coaches are highly skilled in their leadership skills, which can only be attained through, for the most part, 20 plus years of military training and combat experience.  These skills take years to acquire and are hard to find, making these skills marketable.  Further, Check-6 pays Coaches on average, a $1,000 per day.  Fact 35. Finally, many of the Coaches are extremely business-savvy and entrepreneurs.  Most Coaches own their own consulting businesses which Check-6 pays directly, and which in turn pay the Coaches.  Fact 4.  Many affirmatively took action to setup their own company when starting their consultancy work for Check-6.  Fact 4.

Overall, Check-6 provides well for Coaches through great pay and exceptional flexibility.  Coaches have immense bargaining power with Check-6.  The purpose of the FLSA is to protect those workers who cannot protect themselves.  Here, Coaches clearly are not mistreated and can protect themselves even if they were.  Coaches are not vulnerable to the same manipulation and abuse as minimum wage-earners are subject to from large companies.  The FLSA was enacted for a purpose, and this situation does not align with the purpose of the FLSA in protecting those who

---

[3] Check-6 only prohibits Coaches from working for competitors in the same business.  This issue is addressed as part of the elements of the argument on the "economics realities test."

[4] Note 1, supra.

cannot protect themselves.  The Court should not allow the Plaintiffs to use the FLSA in this way because they can protect themselves, possess marketable skills with vast experience, and make *well* above minimum wage.

### B.   COACHES' CONTRACTS WITH CHECK-6 MAKE IT CLEAR THEY ARE INDEPENDENT CONTRACTORS.

The Contractor's Master Services Agreement ("CMSA") makes it clear that the contracting parties believed the relationship entered into was that of an independent contractor relationship. While labels in a contract are not necessarily controlling, they are relevant to the Court's consideration. *Karlson v. Action Process Serv. & Private Investigation, LLC*, 860 F.3d 1089, 1092 (8th Cir. 2017).  The provisions of the CMSA support the label of independent contractor here.

In the opening recitals, the CMSA sets out that "contractors are selected for their unique experiences, individualized performance skills and flexible availability."  Fact 38.  The contractors are to "provide consulting services, client training and/or sales visits."  Fact 38.  The provision identifying the parties' relationship makes it clear both Check-6 and the Coach intended for the relationship to be an independent contractor relationship.  Fact 61.  The CMSA provides that the "[Coach] retains sole and absolute discretion in the manner and means of carrying out the services" to be provided.  Fact 61.  The CMSA states the Coach will be responsible for all taxes, and Check-6 will provide a 1099.  Fact 61.  Coaches are required under the CMSA to carry a wide range of insurance policies, including workers' compensation, employer liability, comprehensive general liability, professional liability, automobile, and umbrella.  Fact 62.

In paragraph 14 (c)(i) of the CMSA, each Plaintiff agreed to comply with all applicable laws, underlying including the FLSA.  Fact 63.  This is a material representation from each of the Plaintiffs to Check-6.  Further, and of critical importance, is the fact that many of the Plaintiffs recited the same canned testimony in their depositions that they became concerned "early on" that they may have been misclassified.  Ironically, however, they continued to sign subsequent annual CMSAs (long after the initial *concern* had set in) without any real support for why they did so.

This is a case of waiver and/or estoppel.

Waiver is the intentional relinquishment of a known right. *In re Sweet*, 954 F.2d 610, 613 (10th Cir. 1992). The elements of waiver are (1) the existence at the time of the waiver a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit. *Id*. Waiver may be express, or inferred from conduct. *Id*. A party may waive any right to which it is legally entitled. *Id*. When waiver is inferred from conduct, the acts, conduct, or circumstances relied upon to show waiver must make out a clear case. *Id*. "An implied waiver can be established by action or conduct which warrants an inference of intent to relinquish." *SFF-TIR, LLC v. Stephenson*, 250 F.Supp. 3d 856, 993 (N.D. Okla. 2017) (citing *Barringer v. Baptist Healthcare of Oklahoma*, 2001 OK 29, 22 P.3d at 701 (Okla. 2001)).

Regarding equitable estoppel, the elements include: "first, there must be a false representation or concealment of facts; second, it must have been made with actual or constructive knowledge of the real facts; third, the party to whom it was made must have been without knowledge, or the means of discovering the real facts; fourth, it must have been made with the intention that it should be acted upon; and fifth, the party to whom it was made relied on, or acted upon it to his or her detriment." *SFF-TIR, LLC*, 250 F. Supp. 3d at 993.

Plaintiffs claim they believed there was an issue, but they chose to forego expressing any concerns to Check-6 because they were happy with their circumstances. They claim they believed they were entitled to overtime, but chose not to pursue it – leaving Check-6 to continue acting under the contractual agreement which Check-6 believed correctly set out the parties' relationship. How can Plaintiffs testify they had concerns in their first year of engagement with Check-6, then sign additional CMSAs in subsequent years, all with the same representation: they would comply with the terms and conditions of the FLSA?  Plaintiffs ignore their contractual obligations to Check-6 which required them, essentially, to: (a) work less than 40 hours per week, or (b) meet one or more exemptions under the FLSA so the FLSA does not apply.  However, they ignore their contractual obligations to Check-6 who paid them in reliance on the language of the CMSAs?

7

In bold language in the CMSA, it states:

> It is the position of the Company and expressly agreed that the Company provides consulting opportunities and provides training material (IP).  Once an assignment is given, the [Coach] is solely responsible for the completion of the assignment.  It is expressly understood that although initial times for work are coordinated to fit the client's operational schedule, it is within the sole discretion of the [Coach] to refuse the work (subject to proper notice and return of retainer) and control the actual work time to the satisfaction of the client.

Fact 61.  This makes it clear the Coach is to work with the client to complete the assignment under the direction of the client.  While many other provisions in the CMSA are an indicia that Coaches are independent contractors, these provisions support a finding of independent contractor status.

## C.  COACHES ARE INDEPENDENT CONTRACTORS AND NOT EMPLOYEES UNDER THE FLSA AND ECONOMIC REALITIES TEST

In Response to Plaintiffs' Motion for Partial Summary Judgment [Doc. 289], Defendants analyze the elements of the Economics Realities Test.  If the Court determines that the FLSA applies, Defendants adopt the arguments made in their Response on this topic.  Based on those arguments, summary judgment is appropriate for Defendants – not Plaintiffs – as the evidence is overwhelmingly for a finding that Plaintiffs are independent contractors, not employees.

In addition, the role as a Coach is appealing to military veterans because of the flexibility, freedom, and ability to control their work.  "The 'gig economy,' is a term that refers to the increased tendency for businesses to hire independent contractors and short-term works, and the increased availability of workers for these short-term arrangements."  https://www.forbes.com/sites/larryalton/2018/01/24/why-the-gig-economy-is-the-best-and-worst-development-for-workers-under-30/.  *Forbes* notes it is estimated that 34 percent of the workforce comprises "gig" workers, which will grow to 43 percent by 2020.  *Id.*  The gig economy allows unemployed, underemployed, or employed individuals to take on "gigs" to earn income or supplemental money with flexibility and freedom.  This new economy has caused tension between it and the laws. Emily Atmore, *Note: Killing the Goose That Laid the Golden Egg: Outdated Employment Laws are Destroying the Gig Economy*, 102 Minn. L. Rev. 887, 908 (2017).

When the FLSA and other laws were enacted, legislators implied a tension between companies and workers; however, the gig economy is mutually beneficial. *Id*.  As the author so articulately described it:

> Gig companies use technology to create a marketplace that connects individuals in need of work with individuals in need of services. It is true that businesses benefit financially from the independent contractor classification, but this also benefits workers by creating job opportunities. By employing a lean business model, gig companies can operate efficiently and pass on savings to customers - simultaneously increasing demand for their services and generating a need for workers to fill this demand, to the benefit of workers. Gig workers desire these job opportunities for the ability to set their own schedules, govern their own work methods, and freely choose and reject projects from one or many companies. The gig business model allows individuals to work free from "structures of the traditional employment relationship." More importantly, it creates an opportunity for individuals to avoid unemployment and poverty by providing a necessary work alternative to disappearing manufacturing and other industrial-era jobs. The gig economy is financially lucrative for both the individual and the workforce as a whole, and harnesses innovation and creativity to deliver better, faster, cheaper services to customers.

*Id*. at 908-09.  This gig economy is mutually beneficial to everyone involved: companies, workers, and customers.  Besides Plaintiffs, the military veterans that contract with Check-6 desire to be independent contractors and not employees.  This allows them to: set their own schedules, work when they want to work, complete a project how they want to, freely choose and reject projects as they want, among other freedoms from control.  Facts 28-29. A reclassification of the independent contractors, Coaches, to employees, would have dire consequences: (1) Coaches would lose their flexibility, which is one of the most vital aspects and appeals of being a Coach; (2) the service would not be affordable to clients; and (3) it would lead to Check-6 not able to provide their service to clients nor would Check-6 be able to provide veterans with this opportunity to make more money than they have before.[5]

The gig economy has created a tension with the laws, but it has also brought freedom and

---

[5] Again, some of these Plaintiffs now work for Check-6's competitors doing the same job, and these competitors contract with their "Coaches" as independent contractors.  Plaintiff Goodly and others testified the amount of money made while contracting with Check-6 was the most they had ever made. Fact 57.  Plaintiffs were paid well and treated as professionals.

flexibility that many working individual's desire.  Coaches desire the flexibility, freedom from control, and independence that Check-6 provides.

### D.    FLSA WHITE COLLAR EXEMPTIONS

Even if the Court finds that Coaches are more like employees than independent contractors, this case should still be dismissed because the FLSA provides exemptions to the overtime pay requirement that apply to these Plaintiffs.  To meet the white-collar exemption, employees must satisfy two conditions: (1) the employee must meet certain tests regarding their job duties, which apply to "any employee employed in a bona fide executive, administrative, or professional capacity;" and (2) the employee must meet the "Salary Test." 29 U.S.C. § 213(a).  The exemptions applicable in this case are: administrative and highly compensated employees.

Further, the Supreme Court has in the past construed the exemptions to the FLSA narrowly. *See A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945).  However, the Supreme Court's recent decision (April 2, 2018) rejected the principle of construing FLSA exemptions narrowly. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018).  The Supreme Court rejected the use of the narrowly construing principle. *Id*. at 1142.  The Court said, "[b]ecause the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, 'there is no reason to give them anything other than a fair (rather than a 'narrow') interpretation.'" *Id*. (citing Scalia, Reading Law, at 363).  Therefore, these exemptions should not be construed narrowly; instead, these exemptions should be given a fair interpretation.

### 1.  Administrative Employee Exemption Exempts Coaches

The most obvious exemption would be the Administrative Exemption.  Employees are exempt from the FLSA wage and hour laws if they meet the Salary Test and:

- The employee's primary duty must be the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

- The employee's primary duty includes the exercise of discretion and independent judgment regarding matters of significance.

29 C.F.R. § 541.200.  Coaches fall under this exemption.  First, Coaches were not performing manual labor, but "coaching," or consulting, the client's employees through their general duties and helping to find more efficient and safer ways to run their business.  The Code states:

> An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. *Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.*

29 C.F.R. § 541.201(c) (emphasis added).  Further, it also states, "management consultants who study the operations of a business and propose changes in organization generally meet the duties requirements for the administrative exemption." 29 C.F.R. § 541.203.  The Department of Labor has provided guidance on the topic:

> Further support for this reasoning can be found in a 1997 opinion letter issued by the Wage and Hour Division of the Department of Labor, which is "entitled to respect" to the extent it is persuasive. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000). In responding to an inquiry on whether background investigators fit within the FLSA's administrative exemption, the opinion letter clarified the type of advice an exempt employee provides: the relevant regulation "is directed at advice on matters that involve policy determinations, i.e., how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation." U.S. Dep't of Labor, Wage & Hour Div., Op. Letter (Sept. 12, 1997). Generally, this requires an exempt employee to participate "in important staff functions of the employer or the employer's clients or customers as opposed to the production functions." *Id.*

*Dewan v. M-I, L.L.C.*, 858 F.3d 331, 337 (5th Cir. 2017).

This applies directly to the situation here.  Coaches are consultants.[6]  Coaches go into Check-6's clients' work place, acting as consultants, to study the operations of the client's business in order to propose changes in the company to optimize efficiency. Fact 59. Coaches are consultants who fall under the administrative exemption.

Plaintiffs will argue that Coaches could not exercise discretion or independent judgment.

---

[6] Again, Plaintiffs admit in their MSJ on page 1.  Also, "consultant" is defined as "professional or expert advice." (Merriam-Webster Dictionary).

However, Coaches were given freedom to exercise discretion and Check-6 encouraged independent judgment, as addressed in Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment. Dfts' Rsp., Section VI(A)(2)(a) [Doc. 289]. <u>That is the job of a consultant: to go into a company, observe and understand the operations, and use their expertise and knowledge to apply it to the unique set of circumstances each business presents.</u> Fact 59. The job of a consultant inherently requires the consultant to use his discretion and independent judgment. Even, this is the reason Check-6 only hires highly experienced military veterans: because of their leadership experience they can implement into organizations by using their own independent judgment. Check-6 does not just contract with just anyone; it *only* contracts with the most experienced military veterans.

### 2.   Salary Test or Fee Basis

To qualify for an exemption, a person also must meet the salary basis test, which means he is paid, on a salary basis, a minimum of $455 per week . . . exclusive of board, lodging, or other facilities. 29 C.F.R. § 541.600.

First, it is irrefutable that each Coach was paid at least $455 every week he worked. Even if a Coach worked just one hour in a week, that Coach was paid $1,000 for each day of an assignment, which clearly eclipses the threshold amount. Fact 44.

Plaintiffs will argue that their compensation was not paid on a "salary basis." However, the Tenth Circuit has considered their situation as "salary basis." "Salary basis" is narrowly defined as when "the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.600(a). But, importantly, exempt employees need not be paid for any workweek in which they perform no work. *Id*; *Hagadorn v. M.F. Smith & Assocs., Inc.*, 1999 U.S. App. LEXIS 2361 *13, N.2 (10th Cir. 1999) (unpublished opinion) (affirming district court's decision holding that the employee plaintiff was not entitled to weekly predetermined amount for weeks in which he performed no work). Check-6 has no obligation to pay its Coaches any amount

for weeks during which they performed no work.

Here, the contractor agreements implicitly agrees to a base salary (or "predetermined amount") of about $1,000 for each day worked on a job. In no circumstance, however, was a Coach ever paid less than the predetermined amount stated in the agreement. The predetermined amount meets the $455 per week threshold amount. Further, even though Coaches were often paid more than $1,000 per week, no Coaches' predetermined amount was ever reduced, except as agreed in each contractor agreement. The Coaches payment structure meets the Salary Test.

Further, the Tenth Circuit has held that a "predetermined amount" need not be rigidly maintained - the amount can fluctuate to accommodate the employer's business needs. *In re Wal-Mart Stores, Inc.*, 395 F.3d 1177 (10th Cir. 2005) ("an employer may prospectively make adjustments in salary with a like adjustment in scheduled hours to accommodate its business needs"). The weekly payment amounts need not be consistent. Instead, they can be amended to reflect reductions or increases in amount of work to be completed. Even if the $1,000 is not considered a "predetermined amount," the weekly pay still meets the Salary Test, despite changing depending upon the number of days each Coach worked each week.

Alternatively, administrative employees can "be paid on a fee basis, rather than on a salary basis." 29 C.F.R. § 541.605(a). An employee is paid on a "fee basis" "if the employee is paid an agreed sum for a single job regardless of the time required for its completion." *Id*. The statute further explains that a fee basis satisfies the payment requirement for the exemption if "the kind of job [] is unique rather than for a series of jobs repeated an indefinite number of times and for which payment on an identical basis is made over and over again. Payments based on the number of hours or days worked and not on the accomplishment of a given single task are not considered payments on a fee basis." *Id*.

> *Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc.*, 204 F.3d 673 (6th Cir. 2000), does not mandate a holding in its favor on Elwell's FLSA claim. In *Fazekas*, a panel of this circuit held that home health care nurses at the Cleveland Clinic, who were paid solely on a fee basis for each patient visit, were exempt professionals who were paid in accordance with § 541.313(b) of

the FLSA regulations. In so doing, the *Fazekas* panel primarily addressed the issue of whether the nurses' patient visits were unique "rather than . . . a series of jobs which are repeated an indefinite number of times and for which payment on an identical basis is made over and over again." 29 C.F.R. § 541.313(b); see also *Fazekas*, 204 F.3d at 676-79.

*Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 839-40 (6th Cir. 2002).

This is exactly the situation here with Check-6 and its Coaches. Check-6 contracted with Coaches, agreeing that they are paid for completing the job. The job takes a certain amount of days, but not a certain amount of hours. The job could only require one hour a day, and that would be all a Coach must work. Check-6 bases the payment of the project off of the number of days the project lasts – with the amount paid equal to $1000 (on average) times the number of days for a total project amount. Fact 35. Coaches bill Check-6 at the conclusion of the job.[7] The bill from the Coach to Check-6 is for a lump sum amount based on this formulation. Coaches know at the time of contracting for a specific job how long the job will be and how much they will earn in consulting fees for the project. Further, each job is unique because it is at a different location, with a different company, under different circumstances, and the client may require different qualifications and certifications. Facts 13,26. This is not a repetitive job.

### 3. Highly Compensated Exemption Applies as Well

The "highly compensated" exemption "applies to employees whose annual salary exceeds a certain threshold, currently set at $134,004." *Howe v. Gov't Leasing Co.*, 2017 U.S. Dist. LEXIS 216565 (D. Colo. Sep. 26, 2017) (citing 29 C.F.R. § 541.601(b)). However, the Department of Labor has clarified that the threshold set to go into effect on December 1, 2016, is not being enforced:

"Note (added January 2018): *

The Department of Labor is undertaking rulemaking to revise the regulations located at 29 C.F.R. part 541, which govern the exemption of executive, administrative, and professional employees from the Fair Labor Standards Act's minimum wage and overtime pay requirements. Until the Department issues its final rule, it will enforce the part 541 regulations in effect on November 30, 2016,

---

[7] Jobs are referred to as "hitches" by Check-6 and the contracting Coaches.

including the $455 per week standard salary level. These regulations are available at: https://www.dol.gov/whd/overtime/regulations.pdf.

https://www.dol.gov/whd/overtime/fs17h_highly_comp.htm.[8] The threshold in effect under the pre-December 1, 2016 was $100,000 and is the amount that should be applied here. The regulation states that a "high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c). An employee will qualify for the exemption if he meets the threshold amount of $100,000 and "customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." *Id.*

First, the Plaintiffs made well over the threshold amount in each year they contracted with Check-6.[9] Fact 34. Further, even if they did not meet the threshold amount, they could have easily met it just by working less than half the year. For many Plaintiffs, Check-6 paid them more than they had ever made in one year, or in multiple years combined even. Fact 57. Check-6 prides itself on providing well for our veterans.

Moreover, Coaches meet the second prong of the exemption because they customarily and regularly performed the duties of an administrative employee: consulting. They performed non-manual work directly related to the general business operations of Check-6's customers, *and*[10] Coaches' primary duty was the exercise discretion and independent judgment in their everyday endeavors because of their role as a consultant to businesses.

---

[8] The Secretary amended the relevant regulations on May 23, 2016. Because the amendment does not provide retroactive effect, this Court relies on the regulations in effect during the relevant timeframe. *Coley v. Vannguard Urban Improvement Ass'n*, 2018 U.S. Dist. LEXIS 50787, at *24 n.4 (E.D.N.Y. Mar. 27, 2018).

[9] "They define 'total annual compensation' to include 'commissions, nondiscretionary bonuses and other nondiscretionary compensation,' and exclude 'board, lodging . . . payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other fringe benefits.' 29 C.F.R. § 541.601(b)(1). The regulations further provide that newly hired employees or those employees who leave before the year is out may qualify as highly compensated employees if their total compensation equals or exceeds a *pro rata* portion of the $100,000 minimum. 29 C.F.R. § 541.601(b)(3) include manual work." *Zelenika v. Commonwealth Edison Co.*, 2012 U.S. Dist. LEXIS 101784, at *34 (N.D. Ill. July 23, 2012).

[10] Both are not necessary, but Coaches can meet both administrative duties.

## III.   CONCLUSION

Even if the Court finds that the FLSA applies, the Economic Realities Test mandates a finding that Check-6 Coaches are independent contractors.  It is also clear that, even if the Coaches are determined to be employees, that they are exempt under both the Administrative Exemption and the Highly-Compensated Employee Exemption.  The result is the same based on all of these theories, Check-6 Coaches are not entitled to overtime compensation.  Summary judgment for Defendants is appropriate.

WHEREFORE, Moving Defendants Check-6 Inc., Yarema Sos, and Brian Brurud, move the Court for summary judgment on all of Plaintiffs' claims, and for such other relief the Court deems just and appropriate.

Respectfully submitted,

By     _/s/ John H. Tucker_____
JOHN H. TUCKER, OBA# 9110
jtucker@rhodesokla.com
DAN S. FOLLUO, OBA# 11303
dfolluo@rhodesokla.com
DENELDA L. RICHARDSON, OBA# 20103
drichardson@rhodesokla.com
RHODES HIERONYMUS JONES TUCKER & GABLE
P.O. Box 21100
Tulsa, Oklahoma 74121-1100
(918) 582-1173; (918) 592-3390 (fax)
**_Attorneys for Defendants, Check-6, Inc., Yarema Sos, and Brian Brurud_**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of June, 2018, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

George Brian Recile, Esq.    gbr@chehardy.coom
Preston Lee Hayes, Esq.     plh@chehardy.com
Jeffrey A. Taylor       jeffataylor@att.net, taylorjeff@mac.com
Jessica Dadas-Schulze     schulze@sgzlaw.com


/s/ *John H. Tucker*