IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JOSEPH GOODLY, on behalf of himself
and other persons similarly situated,

   Plaintiffs,

v.

CHECK-6, INC., YAREMA SOS, BRIAN
BRURUD, DENNIS ROMANO, S. ERIC
BENSON, LAURA OWEN, and JOHN
DILLON,

   Defendants.

Case No. 16-CV-334-GKF-JFJ

# OPINION AND ORDER

In this action, the plaintiffs seek overtime compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*. Before the court is the Motion for Summary Judgment [Doc. No. 293] of defendants Check-6, Inc. ("Check-6"), Yarema Sos, and Brian Brurud. The defendants contend they are entitled to summary judgment because the plaintiffs were independent contractors rather than "employees" within the meaning of the FLSA. Alternatively, the defendants argue that, if the plaintiffs were employees, then certain exemptions to the FLSA's overtime requirements apply. For the reasons set forth below, the court denies the motion.[1]

### I. Background

Check-6 is in the business of providing consultant services to companies in the energy, manufacturing, mining, petrochemical, and transportation industries. [Doc. Nos. 255-1, p. 1 ¶ 1;

---

[1] For the same reasons, the court denies the motion with respect to defendant Laura Owen to the extent she adopted the arguments contained therein [*see* Doc. No. 300, p. 5].

289, p. 8 ¶ 1].[2]  In order to provide these services, Check-6 contracted with individuals, known as "coaches," who acted as consultants at client work sites.  [Doc. Nos. 255-1, pp. 1–2 ¶¶ 2–3; 289, p. 8 ¶¶ 2–3].  Coaches were military veterans who had extensive military training and leadership experience.  [Doc. Nos. 290, pp. 13–14 ¶¶ 55–56; 311-1, p. 13 ¶¶ 55–56].  They were the primary revenue generators for Check-6, which generally paid them a "day rate" for work performed on its behalf.  [Doc. Nos. 255-1, p. 2 ¶¶ 4–5; 289, p. 8 ¶¶ 4–5].

Check-6 interviewed prospective coaches to vet skill sets, languages spoken, specialty during military service, and other relevant attributes.  [Doc. Nos. 290, p. 5 ¶ 14; 311-1, p. 5 ¶ 14].  Coaches went through a new contractor training, and some coaches underwent drug screening.  [Doc. Nos. 255-1, p. 2 ¶¶ 3, 7; 289, p. 8 ¶¶ 3, 7].  Check-6 provided pants, shirts, hard hats, e-mail addresses, and training materials to coaches.  [Doc. Nos. 255-1, p. 2 ¶¶ 9–10, 15; 289, p. 9 ¶¶ 9–10, 15; 240-16].  Check-6 also provided coaches with an "Operations Manual," which coaches were expected to follow.  [Doc. Nos. 255-1, p. 2 ¶ 6; 289, p. 8 ¶ 6; 289-2; 289-4; 289-5].  For example, the "2015 Operations Manual" indicates, among other things, the following:

- that Check-6 will provide certain standardized clothing, [Doc. 289-4, p. 16 § 2.4.2];
- that coaches must provide biographies and pictures to Check-6's marketing department for posting on Check-6's website, [*id.*, p. 17 § 2.5];
- that Check-6 randomly selects coaches each month for drug testing, [*id.*, p. 17 § 2.6];

---

[2] The parties' submissions in connection with the instant motion incorporate by reference their submissions in connection with the plaintiffs' closely related Motion for Partial Summary Judgment [Doc. No. 238].  The court has also considered those submissions in deciding the instant motion.

2

- that, to remain in "good standing," contractors must have a minimum of fifty "client/travel days associated with client events in [the] last 365 days," [*id.*, p. 29 § 3.1.6.1];

- that coaches must follow a particular dress code, [*id.*, p. 37 § 3.3];

- that coaches must upload videos to Check-6's database for management approval before showing them to a Check-6 client, [*id.*, p. 37 § 3.5]; and

- that Check-6 implemented a "Field Standardization Evaluation program," [*id.*, p. 50 § 5.3; *see also id.*, p. 109].

On March 7, 2016, the named plaintiff, Joseph Goodly, commenced this action, asserting claims "on behalf of himself and all others similarly situated." [Doc. No. 1, p. 1 ¶ 1]. On November 4, 2016, the court entered an order conditionally certifying the claims as a collective action pursuant to 29 U.S.C. § 216(b). [Doc. No. 45, p. 7]. The court limited the class of potential plaintiffs in this collective action to the following: "All persons who worked for Check-6, Inc. as 'Coaches' and were paid a 'day rate' at any time in the three years preceding the date of [the] order." [*Id.*]. Thereafter, eighteen opt-in plaintiffs filed consent forms indicating their intent to join the collective action. [Doc. Nos. 49–56, 58, 61–63, 75, 80, 83–85, 95].

## II. Standard of Review

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### III. Analysis

**A. The Plaintiffs' Employment Status**

A central question in this case is whether the plaintiffs were "employees" or "independent contractors" for purposes of the FLSA, which establishes overtime protections for covered employees. *See* 29 U.S.C. § 207(a)(1). Instead of relying on contractual terminology or traditional common-law concepts, the Tenth Circuit applies an "economic realities" test to determine whether an individual is an independent contractor or employee. *Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1235 (10th Cir. 2018) (citing *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998)). The test focuses on "whether the individual is *economically dependent* on the business to which he renders service, or is, as a matter of economic fact, in business for himself." *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 506 (10th Cir. 2012) (quoting *Doty v. Elias*, 733 F.2d 720, 723 (10th Cir. 1984)).

In their briefs, the defendants discuss at length the FLSA's history and purpose. The court agrees with the defendants to the extent they argue that courts should keep in mind the FLSA's

4

purpose when applying the economic realities test and interpreting the statute. The defendants go further, however, and suggest that the court should disregard the economic realities test and rule in their favor based solely on the statute's abstract purpose: "the Economic Realities Test should not be applied here, because the FLSA should be found not to apply." [Doc No. 289, p. 12]. Essentially, the defendants argue that the court need not utilize the economic realities test because it is obvious that the FLSA should not protect the plaintiffs here. [*Id.*]. The court disagrees and, in the pages that follow, applies the economic realities test in accordance with well-established Tenth Circuit precedent.

The defendants also argue that certain provisions within the contracts between Check-6 and the plaintiffs make it clear that the plaintiffs were independent contractors. However, "the economic realities of an individual's working relationship with the employer—not necessarily the label or structure overlaying the relationship—determine whether the individual is an employee under the FLSA." *Acosta v. Jani-King of Oklahoma, Inc.*, No. 17-6179, 2018 WL 4762748, at *2 (10th Cir. Oct. 3, 2018). The inquiry into the plaintiffs' employment status "is not limited to the contractual terminology between the parties or the way they choose to describe the working relationship." *Id.*

Citing the parties' contracts, the defendants further assert that "[t]his is a case of waiver and/or estoppel." [Doc. No. 293, p. 12]. However, the defendants failed to raise waiver and estoppel as affirmative defenses in their answer to the complaint [Doc. No. 29] and therefore waived those defenses. *See* FED. R. CIV. P. 8(c) (requiring a party responding to a pleading to "affirmatively state any . . . affirmative defense, including . . . estoppel . . . and waiver"); *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1167 (10th Cir. 2017) ("[F]ailure to assert an affirmative defense results in waiver of that defense."). Moreover, the defenses of waiver and

estoppel do not apply here, as this is "an area where agreements and other acts that would normally have controlling legal significance are overcome by Congressional policy." *Mencia v. Allred*, 808 F.3d 463, 470 (10th Cir. 2015) (quoting *Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 946 (2d Cir. 1959)).

The Tenth Circuit instructs that, in focusing on the economic realities of the worker's economic dependence on the business, the economic realities ordinarily turn on six factors:

(1) the degree of control exercised by the alleged employer over the worker,

(2) the worker's opportunity for profit or loss,

(3) the worker's investment in the business,

(4) the permanence of the working relationship,

(5) the degree of skill required to perform the work, and

(6) the extent to which the work is an integral part of the alleged employer's business.

*Paragon*, 884 F.3d at 1235. The overarching inquiry depends on the totality of the circumstances, and no single factor is dispositive. *Id.* (citing *Johnson v. Unified Gov't of Wyandotte Cty.*, 371 F.3d 723, 729 (10th Cir. 2004)).

Under the FLSA, "the question of whether a worker is an independent contractor or an employee is a question of law." *Herr v. Heiman*, 75 F.3d 1509, 1513 (10th Cir. 1996). Nevertheless, the "existence and degree of each factor is a question of fact." *Id.* (quoting *Dole v. Snell*, 875 F.2d 802, 805 (10th Cir. 1989)). Courts within this circuit have repeatedly denied summary judgment motions where there remained disputed facts material to the classification of workers as employees or independent contractors. *See, e.g.*, *Herr*, 75 F.3d at 1513; *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 571 (10th Cir. 1994); *Merrill v. Pathway Leasing LLC*, No. 16-CV-02242-KLM, 2018 WL 2214471, at *12 (D. Colo. May 14, 2018); *Renteria-Camacho v.*

*DirecTV, INC.*, No. 14-2529, 2017 WL 4619354, at *3 (D. Kan. Oct. 16, 2017); *Powers v. Emcon Assocs., Inc.*, No. 14-CV-03006-KMT, 2017 WL 4075766, at *7 (D. Colo. Sept. 14, 2017); *Rojas v. Westco Framers, LLC*, No. 15-CV-0168-WJM-KLM, 2016 WL 8540843, at *3 (D. Colo. June 14, 2016). The parties in this case disagree about both the direction in which certain factors point and the degree of their importance.

**1. Degree of Control**

A worker's ability to act autonomously tends to show that he or she is an independent contractor. *See Baker*, 137 F.3d at 1441. Considerations include the plaintiffs' independence in setting their own work hours and other conditions of their work, the extent of Check-6's supervision of the plaintiffs, and the degree of the plaintiffs' ability to work for other employers. *See Paragon*, 884 F.3d at 1235.

The degree of the defendants' control over the plaintiffs is highly contested. The defendants argue that Check-6 did not exercise direct control over coaches in the manner required for employee status. Among other things, the defendants emphasize that coaches worked at the locations of Check-6's clients, that Check-6 did not dictate the hours worked by coaches, and that coaches could and did work for other businesses while under contract with Check-6.

In contrast, the plaintiffs argue that the first factor weighs in favor of classifying the plaintiffs as employees. Among other things, the plaintiffs point to the training and standardization implemented by Check-6—reflected in the operations manuals and other training materials—as evidence that Check-6 exercised extensive control over their work. Furthermore, the defendants concede that the plaintiffs were prohibited from working for clients directly or for competitors while under contract with Check-6. [Doc. No. 290, p. 8 ¶ 31]. At her deposition, Laura Owen, a former CEO of Check-6, indicated that it was unlikely coaches could work other jobs while they were working on Check-6 projects. [Doc. No. 305-1, p. 2]. *Cf. Baker*, 137 F.3d at 1441 (employee

7

status was supported by evidence that remote work sites and other conditions made it "practically impossible" for plaintiffs to work on more than one project at a time). The court finds that genuine disputes of material fact remain as to the degree of control exercised by the defendants.

**2. Opportunity for Profit and Loss**

A worker's ability to earn a profit or suffer a loss based on performance is indicative of independent contractor status. *See Paragon*, 884 F.3d at 1236. The plaintiffs contend that they had no opportunity to earn a profit or suffer a loss because they were paid a fixed day rate. The defendants argue that the plaintiffs had an incentive to work faster and more efficiently because Check-6 did not require coaches to work a specific number of hours each day. The record is unclear, however, regarding the extent to which coaches could, as a practical matter, perform other work while assigned to client projects. The defendants also argue that coaches risked "loss" because a coach "could lose his good reputation and be asked not to come back." [Doc. No. 289, p. 22]. However, reputational loss is a risk for both employees and independent contractors. The court finds that genuine issues of material fact remain as to the second factor.

**3. Investment in the Business**

The third factor compares the investments of the worker and the alleged employer. The relevant "investment" is "the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself." *Dole*, 875 F.2d at 810. The plaintiffs highlight that Check-6 reimbursed coaches for certain expenses. [*See* Doc. No. 289-4, p. 35]. The defendants argue that coaches invested in themselves "by acquiring more qualifications and certifications." [Doc. No. 289, p. 23]. The defendants also argue that the plaintiffs' tax returns, which reflect certain deductions for business expenses, show that the plaintiffs invested in their businesses. [*See, e.g.*, Doc. No. 295, pp. 9, 18]. However, the defendants fail to adequately address how the plaintiffs' investments *compared* to Check-6's investment in the overall business. *Cf.*

8

*Baker*, 137 F.3d at 1442 (noting that the plaintiffs' investments were significant compared to other workers but small when compared to the alleged employer's investment in the overall business); *Renteria-Camacho*, 2017 WL 4619354, at *4 (same). As such, genuine issues of material fact remain as to the third factor.

### 4. Permanence of the Working Relationship

"Independent contractors" often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas "employees" usually work for only one employer and such relationship is continuous and of indefinite duration. *Dole*, 875 F.2d at 811. That said, "even when the relationship is short, the worker may be considered an employee when the relationship is shortened because of the job's 'intrinsic nature' rather than the worker's 'choice or decision.'" *Paragon*, 884 F.3d at 1237 (quoting *Baker*, 137 F.3d at 1442).

Check-6 and coaches entered into Contractor's Master Services Agreements ("CMSAs"), which had indefinite durations. [*See, e.g.*, Doc. Nos. 289-9, p. 1; 289-11, p. 5; 289-12, p. 1; 289-13, p. 1]. Check-6 and coaches also entered into annual contracts, which required renewal in order for a coach to continue receiving coaching assignments. [Doc. No. 289-3, p. 3 ¶ 10; *see, e.g.*, Doc. Nos. 289-8, p. 1; 289-11, pp. 1–2]. Check-6 is a project-based business, with projects varying in length and locale. [Doc. No. 290, p. 11 ¶ 43].

The defendants argue that the fourth factor weighs in their favor because coaches worked on a project-by-project basis and enjoyed the flexibility of choosing projects. However, a reasonable trier of fact could find that this was the result of the "intrinsic nature" of the business rather than the coaches' choice. *See Paragon*, 884 F.3d at 1237. Additionally, the plaintiffs cite deposition testimony from David Burnham—a former manager at Check-6—as evidence that plaintiffs faced potential adverse consequences for declining projects. At his deposition, Mr. Burnham indicated that a coach "could fall out of good standing" by declining a project due to

9

unavailability that had not been scheduled previously with Check-6. [Doc. No. 240-2, p. 11, Tr. 38:12–39:19]. Mr. Burnham also testified that coaches had to be available and that Check-6 "had to be their main job." [Doc. No. 240-3, p. 27, Tr. 209:4–9]. According to Mr. Burnham, once Check-6 hired a coach, the expectation was that "they would just go hitch to hitch to hitch no matter what." [Doc. No. 240-2, p. 17, Tr. 61:2–11]. Similarly, Billy Mac Perry, Jr.—another former manager at Check-6—testified at his deposition that the relationship between Check-6 and coaches was considered to be "ongoing," as opposed to proceeding on a project-by-project basis. [Doc. No. 240-7, p. 9, Tr. 161:25–162:3]. The defendants challenge the credibility of Mr. Burnham and Mr. Perry [Doc. No. 289, p. 23 n.13], but credibility determinations are a jury function. The court finds that there remain genuine disputes of material fact as to the fourth factor of the economic realities test.

5. **Degree of Skill**

A worker is more likely to be considered an employee if his or her job does not require "specialized skills." *Dole*, 875 F.2d at 811. Here, coaches were required to have specialized skills, which they acquired through their extensive military experience. As such, this factor tends to favor classifying the plaintiffs as independent contractors.

6. **Integral Part of the Defendants' Business**

The last factor concerns whether the plaintiffs' services were a necessary component of the defendants' business. The defendants admit that Check-6 generated most of its revenue through its coaches. Accordingly, this factor supports classifying the plaintiffs as employees.

A reasonable trier of fact could make findings as to several of the factors that would support the legal conclusion that the plaintiffs were employees of Check-6. Therefore, the defendants are not entitled to summary judgment on this issue. *See Herr*, 75 F.3d at 1513 (holding that fact issues

precluded summary judgment as to determination of employee status under the FLSA); *Henderson*, 41 F.3d at 570 (same).

## B. Overtime Exemptions

In the alternative, the defendants argue that, if the plaintiffs were employees, then they were exempt from the FLSA's overtime-pay requirements. In particular, the defendants cite two exemptions: the Administrative Employee ("AE") exemption and the Highly Compensated Employee ("HCE") exemption.

### 1. Waiver of Exemptions as Affirmative Defenses

FLSA exemptions are affirmative defenses on which the employer bears the burden of proof. *See Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1153, 1156–58 (10th Cir. 2012). Consequently, an employer's failure to state an FLSA exemption as an affirmative defense in a responsive pleading can result in waiver. *See Diaz v. Jaguar Rest. Grp., LLC*, 627 F.3d 1212, 1214 (11th Cir. 2010).

Here, the defendants failed to raise the AE and HCE exemptions as affirmative defenses in their answer, which they filed on July 18, 2016. [Doc. No. 29]. The defendants moved for leave to file an amended answer on September 19, 2017, nearly thirteen months after the deadline for amendments to pleadings and after the parties had completed significant discovery. [Doc. No. 133]. In their proposed amended answer, the defendants did not specifically identify the AE and HCE exemptions as affirmative defenses, but they did assert that the plaintiffs "are exempt from the FLSA." [Doc. No. 133-1, p. 6 ¶ 6]. On October 19, 2017, this court entered an order denying the defendants' motion for leave to file an amended answer. [Doc. No. 147]. Among other things, the court cited the defendants' undue delay in seeking leave to amend and other dilatory conduct, as well as the undue prejudice to the plaintiffs that would result from the proposed amendments. [Doc. No. 147, p. 3].

The defendants cite *Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir. 2006), in which the Tenth Circuit held that "strict adherence to the pleading requirement is inappropriate when the purpose of the requirement has been otherwise fulfilled." In that case, however, the Tenth Circuit also instructed that "courts should not permit a party to circumvent . . . restrictions on amendments simply by filing a dispositive motion rather than a motion to amend." 435 F.3d at 1202. Rather, courts should "apply the same standards that govern motions to amend when [they] determine whether the defendant should be permitted to 'constructively' amend the answer by means of the summary-judgment motion." *Id.* Here, the court previously denied the defendants' motion to amend. Allowing the defendants to revive the exemptions as defenses now, after the completion of discovery, would be unfairly prejudicial to the plaintiffs. For example, the plaintiffs were deprived of an adequate opportunity to depose witnesses—including Check-6 managers—about the extent to which the plaintiffs' duties were "administrative" or "professional." It would also allow the defendants to circumvent the other grounds for denying their motion to amend, including undue delay. Accordingly, the court finds that the defendants waived the AE and HCE exemptions as affirmative defenses.

2. **Merits**

Even if this court were to consider the merits of the AE and HCE exemptions as affirmative defenses, it would find that the defendants have failed to establish that the plaintiffs were exempt.

Under the AE exemption, the FLSA's overtime-pay provision does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor]." 29 U.S.C. § 213(a)(1). These governing regulations "are entitled to judicial deference and are the primary source of guidance for determining the scope of exemptions to the FLSA." *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1187 (10th Cir. 2015) (quoting *Ackerman v. Coca-Cola*

*Enterprises, Inc.*, 179 F.3d 1260, 1264 (10th Cir. 1999)). To fall within the AE exemption under the regulations, an employee must be compensated "on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities." 29 C.F.R. § 541.200(a)(1). Like the AE exemption, the HCE exemption applies only if the employee's compensation included at least the minimum required weekly amount "paid on a salary or fee basis." 29 C.F.R. § 541.601(b)(1).[3]

### i. Fee-Basis Test

The defendants contend that the plaintiffs were paid on a fee basis. Under the governing regulations, an employee is considered to be paid on a "fee basis" if the employee is paid an agreed sum for a single job regardless of the time required for its completion. 29 C.F.R. § 541.605(a). The regulations explain:

> These payments resemble piecework payments with the important distinction that generally a "fee" is paid for the kind of job that is unique rather than for a series of jobs repeated an indefinite number of times and for which payment on an identical basis is made over and over again. Payments based on the number of hours or days worked and not on the accomplishment of a given single task are not considered payments on a fee basis.

*Id.*

Here, Check-6 used annual contracts, which specified various day rates that Check-6 would pay each coach. [Doc. No. 289-3, p. 3 ¶ 10; *see, e.g.*, Doc. Nos. 289-8, pp. 1–3; 289-11, pp. 1–4; 289-14, p. 11; 289-15, pp. 1–3]. The contracts were general in nature and not specific to particular project assignments. [Doc. No. 289-3, p. 3 ¶ 10]. Although aspects of each project assignment may have been unique, the assignments in general resemble "a series of jobs repeated an indefinite

---

[3] Notably, the Department of Labor revised the regulations addressing highly compensated employees, effective December 1, 2016. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32391 (May 23, 2016). However, these revisions do not alter the court's analysis regarding the disposition of the instant motion.

number of times and for which payment on an identical basis is made over and over again." 29 C.F.R. § 541.605(a). Moreover, the defendants concede that the payments coaches received for assignments were "dependent on the number of days, with coaches being paid $1000, generally, for each day of the assignment." [Doc. No. 290, p. 11 ¶ 44]. Because payments to coaches were based on the number of days worked, Check-6 did not pay coaches on a fee basis.

### ii. Salary-Basis Test

In the alternative, the defendants contend that the plaintiffs were paid on a salary basis. Generally, an employee is considered to be paid on a "salary basis" if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. 29 C.F.R. § 541.602(a). Exempt employees need not be paid for any workweek in which they perform no work. *Id.* Furthermore, the regulations provide:

> An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned.

29 C.F.R. § 541.604(b).

The defendants argue that the plaintiffs were paid on a "salary basis" because they were paid a day rate of about $1,000, thereby guaranteeing that, in any week worked, they would receive in excess of the $455 per week minimum under the FLSA. Courts have taken differing views on the legal merits of such arguments. *Compare McQueen v. Chevron Corp.*, No. C 16-02089 JSW, 2018 WL 1989937, at *1 (N.D. Cal. Apr. 3, 2018) (rejecting argument that day rate exceeding $1,000 satisfied salary-basis requirement), *reconsideration denied*, 2018 WL 2552248, at *1 (May

9, 2018), *with Faludi v. US Shale Sols. LLC*, No. CV H-16-3467, 2017 WL 5969261, at *10 (S.D. Tex. Nov. 30, 2017) (holding that $1,000 day rate satisfied salary-basis requirement), *appeal filed*, No. 17-20808 (5th Cir. Dec. 26, 2017).

This court need not reach the legal question of whether a sufficiently large day rate can satisfy the salary-basis requirement. Regardless of the answer, the defendants have failed to substantiate with evidence their assertion that "each Coach was paid at least $455 every week he worked." [Doc. No. 293, p. 17]. In their statement of material facts, the defendants assert that coaches "were paid an amount for each assignment that equals to $1,000 per day *for every day they were assigned to a client's site*." [Doc. No. 290, p. 10 ¶ 35 (emphasis added)]. However, this assertion does not address other days—when coaches were not assigned to client sites. Time spent on job-related training and travel away from home during the workday can count as hours worked. *See* 29 C.F.R. §§ 785.27, 785.29, 785.38, 785.39. Many of the annual contracts specify that coaches would receive $400 for training and domestic travel days. [*See, e.g.*, Doc. Nos. 289-8, pp. 1–3; 289-11, pp. 1–4; 289-15, pp. 1–3]. A coach who only spent a single day on training or domestic travel in a week, at a rate of $400 per day, would not receive the weekly minimum amount required under the salary-basis test.

Moreover, Check-6's operations manual suggests that Check-6 expected coaches to perform various tasks—such as completing orientation lessons and "Pre-Event Prep"—at times when they were not at client sites. [*See, e.g.*, Doc. No. 289-5, pp. 57–62]. Consistent with the operations manual, several plaintiffs indicated in deposition testimony or sworn declarations that coaches were expected to perform—and did perform—work when they were not at client sites. [*See, e.g.*, Doc. Nos. 322-1, p. 42, Tr. 37:8–12; 297-2, p. 2 ¶ 8; 297-3, p. 2 ¶ 8]. Time spent on such tasks could also count as hours worked. *See* 29 C.F.R. § 785.12 ("If the employer knows or

has reason to believe that the work is being performed, he must count the time as hours worked."). The defendants have not established that the plaintiffs were guaranteed at least the weekly minimum required amount for every week in which they completed such tasks.

The defendants assert that, "even if sometimes Plaintiffs performed work which was not compensated, it would have been immediately adjacent to work which was compensated" and that "the hitch itself . . . would more than make up for whatever 'unpaid' work was performed on the preceding day." [Doc. No. 322, p. 8]. This argument has two flaws. First, the defendants fail to cite evidence in support of the adjacency proposition. Second, even if it so happened that the plaintiffs received more than $455 for every week in which they worked, the defendants have failed to establish that "the employment arrangement also include[d] a *guarantee* of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked." 29 C.F.R. § 541.604(b) (emphasis added); *see also Roshon v. Eagle Research Grp., Inc.*, 314 F. Supp. 3d 852, 862 (S.D. Ohio 2018) (denying summary judgment where defendant failed "to prove that Plaintiff was guaranteed the threshold minimum salary that would permit him to be considered an exempt employee"); *Snead v. EOG Res., Inc.*, No. 5:16-CV-1134-OLG, 2018 WL 1151138, at *3 (W.D. Tex. Feb. 13, 2018) ("[E]vidence that Plaintiff regularly received a qualifying amount of pay is not the same as evidence that he was guaranteed to receive that amount regardless of the quality or quantity of work he performed."). Accordingly, the defendants have failed to establish that Check-6 paid the plaintiffs on a salary or fee basis, as required for the AE and HCE exemptions to apply.

## IV.  Conclusion

WHEREFORE, the Motion for Summary Judgment [Doc. No. 293] of defendants Check-6, Inc., Yarema Sos, and Brian Brurud is denied.

IT IS SO ORDERED this 18th day of October, 2018

_____
GREGORY K. FRIZZELL, CHIEF JUDGE